# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LANDMARK AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15 C 1785 |
| DEERFIELD CONSTRUCTION, INC., and SHAWN GRAFF, | ) ) ) | Chief Judge Rubén Castillo |
| Defendants. | ) ) ) | |
| | | |
| DEERFIELD CONSTRUCTION, INC., and SHAWN GRAFF, | ) ) ) | |
| Third-Party Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| AMERICAN STATES INSURANCE COMPANY, LAW OFFICES OF MEACHUM, STARCK, BOYLE & TRAFMAN, and DAVID OLMSTEAD | ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Following the entry of an adverse judgment in a personal injury case, secondary insurance provider Landmark American Insurance Company ("Landmark") brought this action against Deerfield Construction, Inc., and its employee Shawn Graff (collectively, "Deerfield") seeking a declaratory judgment that Deerfield is not entitled to coverage under the Landmark insurance policy. (R. 1, Compl.) Presently before the Court are Landmark's motion for summary

judgment pursuant to Federal Rule of Civil Procedure 56, (R. 86, Mot. for Summ. J.), and

Deerfield's motion for disqualification and sanctions against Landmark and its law firm, Traub

Lieberman Straus & Shrewsberry LLP ("Traub"), (R. 128, Mot. to Disqualify). For the reasons

stated below, both motions are denied.

## RELEVANT FACTS

The following facts are undisputed unless otherwise stated.[1] Deerfield took out two

commercial automobile liability policies effective March 1, 2007, to March 1, 2008: a primary

insurance policy from American States Insurance Company ("American States") with a policy

limit of $1 million, and a "follow-form" secondary insurance policy, which adopts the terms and

conditions of the primary insurance policy, from Landmark with a policy limit of $10 million.

(R. 121, Deerfield's Resp. to Facts ¶¶ 1-2.)

On January 16, 2008, Deerfield's employee Shawn Graff was involved in an automobile

accident with third-party Ryan Keeping ("Keeping"). (*Id.* ¶ 8.) On December 22, 2009, Keeping

filed a personal injury lawsuit (the "Keeping case") against Deerfield in the Circuit Court of

Cook County, Illinois, and served notice on Deerfield shortly thereafter. (*Id.* ¶¶ 9-10.) Shortly

after receiving notice of the lawsuit, Deerfield provided notice to American States and Arthur J.

Gallagher Risk Management Services, Inc. ("AJG"), the insurance broker Landmark used to

procure its insurance policies. (*Id.* ¶ 11; *id.*, Deerfield's Add'l Facts ¶ 6.) Between December

2009 and December 2014, Deerfield did not directly communicate with Landmark regarding the

Keeping case or provide it with any related documents, nor did American States or AJG take

such actions. (*Id.*, Deerfield's Resp. to Facts ¶¶ 13-16.) Landmark first received direct notice of

the accident and the Keeping case on December 5, 2014. (*Id.* ¶ 20.)

---

[1] For unknown reasons, Landmark failed to provide any response to Deerfield's proposed additional facts. (*See* R. 121, Deerfield's Add'l Facts.) Therefore, these facts are deemed admitted. See N.D. ILL. L.R. 56.1(b)(3)(B); *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000).

From 2009 to 2014, the parties in the Keeping case engaged in discovery. (*Id.* ¶ 17.) Throughout this period, Deerfield was represented by David Olmstead ("Olmstead"), an attorney with the firm of Meachum, Starck, Boyle & Trafman, who was assigned to the defense by American States. (*Id.*, Deerfield's Add'l Facts ¶ 3.) At all times prior to the entry of a verdict in the Keeping case, American States and Olmstead believed that Deerfield would probably receive a verdict in its favor and believed that damages, if awarded, would be less than the $1 million policy limit of the American States policy. (*Id.* ¶ 4.)

On December 5, 2014, Tiffany Krueger of AJG notified Landmark of the Keeping case. (*Id.* ¶ 6.) It is common industry practice for an excess insurer to receive notice of accidents and lawsuits through the broker or insurance agent, and it is Landmark's custom and practice to receive notification in this manner and to communicate with its insureds using brokers and agents rather than directly. (*Id.* ¶ 7.) Landmark does not intend for its insureds to give notice of every claim, but instead only those where the excess policy is implicated. (*Id.*)

Landmark was informed that Keeping had made a demand of $1.25 million, $250,000 more than the limit of the American States policy. (*Id.* ¶ 6.) On December 10, John Graham ("Graham"), a vice president of Landmark, spoke with Lisa Cruser ("Cruser") from American States. (*Id.* ¶ 8.) After consulting with Cruser, Graham requested a pretrial report and informed Cruser that he did not see the Keeping case exceeding American States's policy limits, so he would not follow the case and would close his file on it. (*Id.*) Later that day, Cruser emailed Graham the pretrial report, and he responded that he had changed his mind and would keep his file open. (*Id.* ¶ 9.)

Graham assigned the claim to Kevin O'Connor ("O'Connor"). (*Id.*) On December 12, O'Connor emailed a letter to AJG—but not to Deerfield—acknowledging receipt of the claim.

(*Id.* ¶ 10.) On the same day, O'Connor informed Cruser that Landmark "has the excess coverage for this loss" and requested copies of all Olmstead's reports on the Keeping case going forward. (*Id.* ¶ 11.) Landmark was provided access to anything needed to evaluate the claim. (*Id.*) After reviewing these materials, O'Connor evaluated the case as having a settlement value of between $500,000 and $750,000, and Landmark set a reserve of one dollar on the Keeping case, which is the minimum requirement for any open claim. (*Id.* ¶ 12.)

The Keeping case went to trial on January 12, 2015. (*Id.*, Deerfield's Resp. to Facts ¶ 21.) On January 16, the final day of trial, O'Connor emailed Cruser and asked whether the trial had begun; in response, Cruser provided an independent adjuster's trial reports to O'Connor. (*Id.*, Deerfield's Add'l Facts ¶ 14.) O'Connor evaluated the trial and suggested that further settlement discussions occur. (*Id.*) Cruser attempted to negotiate a high-low settlement with Keeping to set a maximum and minimum award regardless of the jury's verdict. (*Id.* ¶ 15.) The parties agreed on a high of $1 million, but could not agree to a minimum verdict. (*Id.*) Cruser offered a low of $75,000 and Keeping last demanded $175,000 as a low. (*Id.*) Cruser asked Landmark whether it was willing to contribute to the high-low settlement, but it did not offer any money. (*Id.* ¶ 16.) Graham suggested that Cruser settle the case for "$100k-$500k or $750k first" and, if necessary, $1 million. (*Id.*) At no point during trial did Landmark demand that mediation occur, demand that Olmstead be replaced as counsel, request that the trial be continued, or offer money to contribute toward a settlement. (*Id.* ¶ 13.) O'Connor and Graham later testified that, if Landmark had received notice earlier, the only thing they would have done differently would be to receive litigation reports earlier and encourage that dispute resolution or mediation occur. (*Id.* ¶ 19.)

On January 16, 2015, the jury returned a verdict in Keeping's favor for $2,368,000. (*Id.*, Deerfield's Resp. to Facts ¶ 22.) Cruser informed O'Connor of the verdict on January 19, and

4

O'Connor replied to this email informing her that he was "assigning counsel to review the case for us." (*Id.*, Deerfield's Add'l Facts ¶ 22.) After learning of the verdict, O'Connor conducted "a lengthy phone conference" with an AJG employee. (*Id.*) On January 19, O'Connor assigned Traub to meet with Olmstead and to review the case, trial, post-trial motions, and any appealable issues. (*Id.* ¶ 23.) O'Connor also assigned Traub to provide him with a report of Olmstead's files and to identify any coverage issues. (*Id.* ¶ 24.) Sometime between January 19 and January 27, Traub attorneys met with Olmstead, reviewed his file, and provided a lengthy report and analysis of the file to Landmark. (*Id.* ¶ 25.) On January 27, Cruser wrote to O'Connor and informed him that Olmstead had identified issues for a post-trial motion and appeal and asked that Landmark contact him to work with him for Deerfield. (*Id.* ¶ 26.) Cruser also asked whether Landmark wished to take over the handling of the Keeping case. (*Id.*)

On January 29, 2015, Landmark notified Deerfield for the first time through a letter authored by O'Connor and Traub attorneys that it was reserving its rights to deny coverage due to late notice. (*Id.* ¶ 28-29.) According to Deerfield, Landmark had never directly communicated with Deerfield prior to this reservation of rights letter.[2] (*Id.* ¶ 28.) Cruser later testified that, if she knew that O'Connor had assigned Traub as coverage counsel, she would not have authorized Olmstead to provide his files or work product to Traub. (*Id.* ¶ 27.)

## PROCEDURAL HISTORY

On February 27, 2015, Landmark filed its complaint in this case, seeking declaratory judgment that it was not required to indemnify Deerfield because of late notice. (R. 1, Compl.) Deerfield filed its amended answer and counterclaim on June 24, 2015, (R. 22, Am. Answer & Countercl.), and on July 22, 2015, filed a third-party complaint against American States, AJG,

---

[2] As noted below, there is evidence in the record that Landmark communicated directly with Deerfield on one occasion in a February 2010 email. (R. 136-2, Underwriting File at 7.)

Olmstead, and Meachum, Starck, Boyle & Trafman, (R. 28, Third-Party Compl.). On September 18, 2015, third-party defendant AJG filed a motion to dismiss the third-party complaint, (R. 55, AJG's Mot. to Dismiss), which was joined by Olmstead and Meachum, (R. 59, Olmstead's Mot. to Dismiss), and American States, (R. 75, American States's Joinder). On May 19, 2016, this Court entered a memorandum opinion and order dismissing all counts of the third-party complaint against AJG but denying the motions with respect to the other third-party defendants. (R. 105, Mem. Op. & Order.)

On January 19, 2016, Landmark filed the present motion for summary judgment. (R. 86, Mot. for Summ. J.) Landmark argues that, based on the undisputed sequence of events in the Keeping case, it is entitled to summary judgment as Deerfield did not provide it with timely notice of the accident or the Keeping case. Landmark argues that its secondary insurance policy, which adopts all the terms of the American States policy, requires that it be given "prompt" notice of an accident and that Deerfield "immediately" provide Landmark with information regarding a suit. (R. 87, Mem. at 5-8.) Because the Landmark policy does not specify that only claims "reasonably likely" to implicate the policy must be reported, Landmark argues that Deerfield had no discretion regarding whether to report the claim and that reporting the lawsuit to Landmark five years after its initiation—just one month before trial—was per se unreasonable. (*Id.* at 8-11.) Due to the "extreme delay" in reporting the claim, Landmark argues that it need not establish prejudice from Deerfield's alleged tardiness; even if required to show prejudice, however, Landmark argues that its late entry into the case deprived it of the opportunities to investigate the claim, take part in discovery, and engage in early settlement discussions. (*Id.* at 12-14.) At a motion hearing on February 17, 2016, this Court entered and continued Landmark's

motion until the close of discovery, which was ultimately extended until August 31, 2016. (R. 99, Min. Entry; R. 117, Min. Entry.)

On September 16, 2016, Deerfield filed its response. (R. 119, Deerfield's Resp.) Deerfield argues that AJG was Landmark's agent for purposes of notification on either an express or apparent theory of agency. (R. 120, Mem. in Opp'n at 3.) First, Deerfield argues that the American States policy designated AJG as American States's agent; by adopting all the terms of that policy without identifying its own authorized representative, Deerfield claims that Landmark adopted AJG as its actual agent. (*Id.* at 3-4.) Alternatively, Deerfield argues that notice to AJG was effective on Landmark under the doctrine of apparent agency. (*Id.* at 4-6.) Based on Landmark's alleged practice of communicating with Deerfield exclusively through AJG, Deerfield contends that a reasonable insured would believe that AJG was Landmark's agent for purposes of notice. (*Id.* at 5-6.) Even if AJG was not Landmark's actual or apparent agent, Deerfield argues that the notice Landmark received in December 2014 was reasonable as to an excess insurer. (*Id.* at 6-14.) Deerfield contends that under Illinois law, excess policies allow the insured more discretion when to report claims than primary policies. (*Id.* at 8.) Deerfield points out that O'Connor testified in his deposition that Landmark does not intend for its insureds to automatically give it notice of every claim, but instead only those claims that implicate the excess policy. (*Id.*; *see* R. 121, Deerfield's Add'l Facts ¶ 7.) Because no party involved in the Keeping case reasonably believed that the Landmark policy would be implicated, and because Deerfield contends that Landmark suffered no prejudice from the late notice, Deerfield argues that its pretrial notice was reasonable.[3] (R. 120, Mem. in Opp'n at 10-12.) Finally, Deerfield argues that Landmark is estopped from denying coverage because it failed to

---

[3] American States also filed a response to Landmark's motion for summary judgment on September 16, 2016, which forwards similar arguments that notice to Landmark was reasonable under the circumstances and that Landmark suffered no prejudice from any delay. (*See* R. 124.)

notify Deerfield of its intent to do so when settlement negotiations were proceeding. (*Id.* at 14-15.)

Landmark replied on October 7, 2016. (R. 136, Reply.) Landmark argues that it did not adopt AJG as its agent through its follow-form policy, and that its use of and sole communication with Deerfield through its own agent, McAuley Woods, demonstrates that it granted no authority to AJG. (*Id.* at 8-16.) Landmark further argues that the policy language on its face granted Deerfield no discretion in when to report the claim, superceding Illinois law regarding the differences between primary and excess insurance. (*Id.* at 21-28.) It also contends that Deerfield's notice was unreasonably late under the circumstances and that it is not required to show prejudice from the delay. (*Id.* at 28-33.) Finally, Landmark argues that it is not estopped from raising a late-notice coverage defense as it had no obligation to disclose its coverage defense and Deerfield did not detrimentally rely on Landmark providing coverage, especially as the breakdown in settlement negotiations was over the "low" of the high-low settlement, with the "high" agreed to at the American States policy's limit. (*Id.* at 16-20.)

On September 28, 2016, Deerfield filed its motion to disqualify Traub and to impose sanctions on Traub and Landmark. (R. 128, Mot. to Disqualify.) Deerfield argues that, by simultaneously assisting with post-trial issues and investigating coverage defenses on Landmark's behalf, Traub violated its ethical obligations under ABA Model Rules of Professional Conduct 1.7 and 1.9, which prohibit conflicts of interest against current clients and former clients, respectively. (*Id.* at 4-5.) Deerfield further argues that Traub intentionally violated its attorney-client obligations in bad faith, obtaining access to confidential information in

Olmstead's case file by misrepresenting that it was acting only in Deerfield's interest.[4] (*Id.* at 8-9.)

Landmark and Traub responded separately on November 1, 2016, raising similar issues. (R. 143, Landmark's Resp.; R. 144, Traub's Resp.) Landmark argues that there was no impropriety in its gaining access to the Keeping case file, as it had a right to access the file under Illinois law. (R. 143, Landmark's Resp. at 6-7.) Further, because Landmark argues its late-notice defense does not rely upon any privileged materials from Olmstead's file, it contends that Deerfield has failed to show any prejudice from the alleged conduct. (*Id.* at 7-9.) Finally, even if Traub did misrepresent its intentions as Deerfield claims, Landmark argues that any such misrepresentation occurred without Landmark's direction as there is no evidence that it instructed Traub to lie, but instead that Landmark retained Traub to promote Landmark's own interests in the Deerfield matter. (*Id.* at 9-11.) Traub concurs that it was retained solely to represent Landmark's interests, not Deerfield's, and that it did not state otherwise to Deerfield. (R. 144, Traub's Resp. at 2-3.) Traub argues further that it never formed an attorney-client relationship with Deerfield, which was unaware of Traub's involvement in the case, and thus that it cannot have violated the Model Rules regarding conflicts of interest between clients. (*Id.* at 4-8.) Traub also contends that it did not obtain any confidential information from Olmstead's file, as Landmark had a right to access these materials and they were not relevant to the controversy before this Court. (*Id.* at 11-15.)

---

[4] Deerfield also moved to stay briefing on the motion for summary judgment until the motion to disqualify had been ruled upon, arguing that there was a danger that Landmark would submit or rely upon improperly obtained materials from its case file in supporting its case. (R. 134, Mot. to Stay.) This Court denied that motion, finding that Deerfield's motion was untimely, coming days before Landmark's reply brief was due when all the facts relied upon in the motion to disqualify had been in the record for months. (R. 137, Min. Entry.)

In its reply, Deerfield argues that Traub created an attorney-client relationship by suggesting to Olmstead that it was assisting in Deerfield's post-trial defense and performing work on its behalf. (R. 147, Reply at 5-8.) Deerfield argues that the discoverability of Olmstead's file is beside the point, as the alleged ethical violation arises from obtaining access to the file under the false pretenses that Traub was representing Deerfield and "[a]ny information gained from that disclosure is the result of unethical conduct and may have caused Landmark to deny coverage." (*Id.* at 8.) Finally, Deerfield contends that it was prejudiced in various ways: (1) if Traub was assigned to review the case file to determine whether to deny coverage, "then the review of Olmstead's file was important to Landmark's decision to file this lawsuit against Deerfield," (*id.* at 10); (2) violation of Model Rules 1.7 and 1.9 "in and of itself[] prejudices Deerfield," (*id.* at 11); (3) Traub was materially limited in its assignment to assist in Deerfield's defense by its simultaneous assignment to identify coverage issues, (*id.*); and (4) Traub's "conduct, in and of itself, prejudices Deerfield because it sows distrust in the members of the bar," (*id.*).

## LEGAL STANDARD

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752

F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation marks and citation omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (internal quotation marks and citation omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

At this juncture, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). In other words, "summary judgment cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Instead, the Court's role is simply "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

**ANALYSIS**

Currently pending before this Court are Landmark's motion for summary judgment and Deerfield's motion for disqualification and sanctions. The Court will address each in turn below.

## I.     Motion for Summary Judgment

The ultimate question in this case is whether Deerfield provided notice of Graff's accident and the Keeping case to Landmark in accordance with the notice provisions of the policy. In its motion, Landmark states that "[t]here is no dispute that Defendants (and their agents and representatives) waited nearly seven years to provide Landmark with notice of the Accident and nearly five years to provide Landmark with notice of the Underlying Lawsuit." (R. 87, Mem. at 2 (footnotes omitted).) Accordingly, Landmark's motion for summary judgment focuses on whether Deerfield provided "prompt" notice of the January 2008 accident or "immediate[]" notice of the lawsuit filed December 2009 in light of the fact that Landmark learned of both for the first time on December 5, 2014. (*Id.* at 5.)

In its response, Deerfield contends that its notice was sufficient as to an excess insurer, principally arguing that notice was not required until it was reasonably likely that Landmark's coverage would be implicated. (R. 120, Mem. in Opp'n at 6-14.) In addition, Deerfield argues that Landmark received sufficient notice shortly after the accident when Deerfield notified AJG. (*Id.* at 3-6.) Deerfield argues that, by issuing a "follow-form" policy that adopts the terms in American States's policy, Landmark "assumes the designation of AJG as its agent for purposes of notice." (*Id.* at 3.) The American States policy provides that Deerfield must, "[i]n the event of 'accident,' claim, 'suit' or 'loss,' . . . give us or our authorized representative prompt notice." (R. 1-3, American States Policy at 49.) Although "our authorized representative" is not defined in the policy, the American States policy identifies AJG as its "Agent" and provides AJG's contact

12

information. (R. 120, Mem. in Opp'n at 3.) Deerfield argues that by adopting the terms and

conditions of the American States policy without designating its own authorized representative,

Landmark also adopted its designation of AJG as an authorized representative able to receive

notice on its behalf. (*Id.*) Even if Landmark did not intend that AJG would serve as its agent,

Deerfield argues that Landmark's course of conduct, particularly by communicating with

Deerfield exclusively through AJG, created an apparent agency. (*Id.* at 4-6.)

 In its reply, Landmark argues that AJG was neither an express nor an apparent agent of

Landmark. (R. 136, Reply at 8-16.) Landmark states that, unlike American States, it did not enter

into any agency agreement with AJG, instead authorizing McAuley Woods as its agent in

connection with the Landmark policy. (*Id.* at 8-10.) Landmark further denies that its follow-form

policy adopted AJG as an authorized representative and that Landmark vested AJG with any

apparent authority. (*Id.* at 10-16.) As Landmark notes, the American States policy defines the

terms "we," "us," and "our" to mean "the Company providing this Insurance," which is

American States. (*Id.* at 11 (quoting R. 1-3 at 43).) The Landmark policy, meanwhile, specifies

that these terms refer to "the COMPANY shown in the DECLARATIONS," that is, Landmark.[5]

(*Id.* (quoting R. 1-4 at 3).) Landmark argues that the notice provision, as incorporated in the

Landmark policy, means that Deerfield must give notice to *Landmark's* authorized

representative, not American States's. (*Id.*)

---

[5] In the interest of accuracy, the Court notes that the Landmark policy only specifically states that "we"
and "us" refer to Landmark without mentioning "our." (R. 1-4, Landmark Policy at 3.) The Court declines
to attach any significance to this omission, as under Illinois law contracts must be read as a whole. *United
States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015) (citation omitted). Because "our" must
refer to the insurer operating the policy for it to operate as the parties intended, the Court finds that this is
the only reasonable interpretation of the policy. (*See, e.g.*, R. 1-3 at 50 ("At our option, we may: a. Pay
for, repair or replace damaged or stolen property; b. Return the stolen property, at our expense. We will
pay for any damage that results to the "auto" from the theft[.]").)

Under Illinois law, "[a]n insurance policy is a contract, and its construction is reviewed *de novo* as a question of law."[6] *Barth v. State Farm Fire & Cas. Co.*, 886 N.E.2d 976, 982 (Ill. 2008). In interpreting an insurance policy, "a court's primary objective is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). The policy must be "construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Id.* Additionally, "[i]f the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." *Id.* Conversely, "if the words used in the policy are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the drafter." *Id.*; *see also Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1217 (Ill. 1992) ("Ambiguous terms are construed strictly against the drafter of the [insurance] policy and in favor of coverage.").

As a preliminary matter, the Court finds that Landmark did not adopt AJG as its authorized representative by issuing its follow-form policy. Although the parties argue at length about the policy's particular wording and inferences that can be drawn from it, neither party seems to recognize that Landmark did explicitly identify its own authorized representative. The pages setting forth the Landmark policy's terms are signed by two principals from RSUI Indemnity Company, Landmark's parent company. (R. 1-4, Landmark Policy at 4.) Immediately before these signatures, the policy states: "This policy is not valid unless countersigned on the Declaration page by our fully authorized representative." (*Id.*) The declaration page is signed by a James A. Dixon over a line labeled "Authorized Representative." (*Id.* at 7.) The American States contract does not define or identify any "authorized representative," and thus it is

---

[6] The parties agree for purposes of the present motion that Illinois law applies. (*See* R. 42, Def.'s Mem. at 6 n.3; R. 48, Pl.'s Resp. at 8-11.)

reasonable to believe that AJG, which is listed as "Your Independent Safeco Agent" on the policy, should be interpreted as that representative. (R. 1-3, American States Policy at 9.)However, the Landmark policy only follows form as to "the same terms, conditions, agreements, exclusions and definitions as the 'Underlying Insurance,' except: . . . (2) With respect to any provisions to the contrary contained in this insurance." (R. 1-4, Landmark Policy at 3.) By clearly indicating in the policy itself that it had assigned its own authorized representative, Landmark avoids the ambiguity of the American States policy. Viewing the Landmark policy as a whole, there can be no ambiguity that Landmark did not adopt AJG as its authorized representative for purposes of the notice provision.

Further, the Court finds that even if Landmark had adopted AJG as its authorized representative as Deerfield argues, this alone would not suffice to establish that Deerfield complied with the policy's notice provision. The notice provision has several subsections and specifies that Landmark has "no duty to provide coverage under this policy unless there has been full compliance with" each; subsection (a) requires Deerfield to give notice of the accident to "us or our authorized representative," but subsection (b) states: "Additionally, you and any other involved 'insured' must: . . . (2) immediately send *us* copies of any request, demand, order, notice, summons or legal paper received concerning the claim or 'suit.' " (R. 1-3, American States Policy at 49 (emphasis added).) In short, Deerfield was required to give notice to Landmark or its representative, but it was also required to provide any legal documents to Landmark itself, by the plain language of the policy. The only mention in the policy of an authorized representative is in the subsection of the notice provision requiring notice that an accident occurred or a claim exists. The requirement to provide legal documents does not fall under this subsection in such a way that the policy could be read to allow notice to be given to

such a representative; instead, it is separated into a new subsection which is "[a]dditional[]" to the preceding notice of an accident and specifies on its own part that the legal documents must be given to Landmark. (*Id.*) Thus, even assuming that Landmark adopted AJG as its authorized representative under the policy, Deerfield would still be obligated to provide any legal documents "immediately" to Landmark, not AJG, in order to comply with the notice provision. Because Deerfield did not do this, whether Landmark adopted AJG as its authorized representative or not does not determine this case.

If AJG was Landmark's agent, however, then notice to AJG would constitute notice to Landmark, satisfying both subsections of the policy's notice provision. *See First Chi. Ins. Co. v. Molda*, 36 N.E.3d 400, 487-88 (Ill. App. Ct. 2015) (notice given to an agent is imputed to a principal when the agent has no adverse interest). Landmark notes in its reply that, although American States entered into an agency agreement with AJG, Landmark did not have any such formal agreement. (R. 136, Reply at 8-10.) Instead, Landmark used its own insurance broker, McAuley Woods, to communicate with AJG. (*Id.* at 13-14; *see also* R. 136-2 at 20, 22, 42 (emails showing Landmark communicating with McAuley Woods as its agent in negotiating the policy with Deerfield).) Because Deerfield has failed to produce any contrary evidence that Landmark appointed AJG as its agent, the Court finds that AJG was not Landmark's actual agent.

Even if Landmark did not explicitly vest AJG with authority to act as its agent, however, Deerfield argues that Landmark's conduct would lead a reasonable insured to believe that AJG was Landmark's agent for purposes of notice under the doctrine of apparent agency. (R. 120, Mem. in Opp'n at 3-6.) Under Illinois law, an insurance broker is typically considered to be the agent of the insured rather than the agent of the insurance company unless the broker is a general

agent of the insurance company. *Molda*, 36 N.E.3d at 415. However, depending on the facts of a particular case, a broker may also serve as the agent of the insurer, or both the insured and the insurer. *State Sec. Ins. Co. v. Burgos*, 583 N.E.2d 547, 551 (Ill. 1991). Even when an insurer does not explicitly grant a broker authority to act on its behalf, the insurer still may invest the broker with apparent authority to act as its agent, including for purposes of notice. *Molda*, 36 N.E.3d at 415. Thus, where the insurer "creates, through words or conduct, the reasonable impression that the putative agent has been granted authority to perform certain acts," the insurer "will be bound by the authority [it] *appears* to give to another, as well as that authority which [it] actually gives." *Burgos*, 583 N.E.2d at 551. Apparent authority is based on the actions of the insurer, not the broker, and is "that authority which a reasonably prudent person . . . would naturally suppose the agent to possess." *Id.* Accordingly, to establish apparent agency a party "must prove that (1) the principal or its agent acted in a manner that would lead a reasonable person to believe that the individual allegedly at fault was an employee or agent of the principal; (2) the principal had knowledge of and acquiesced in the acts of the agent; and (3) the injured party acted in reliance upon the conduct of the principal or its agent, consistent with ordinary care and prudence." *Molda*, 36 N.E.3d at 416.

In cases concerning the authority of insurance brokers to act on behalf of insurers, and insurer may be estopped from denying that a broker is its agent "[w]here an insurer's manner of dealing with the broker in regard to the insured would lead the insured to believe that the broker had the authority to perform the acts in question." *Id.* (citation omitted). The broker has apparent authority "where the insurer knowingly *causes* or *permits* the broker to act so as to justify the insured in believing that the broker possesses the authority exercised." *Burgos*, 583 N.E.2d at 551. Ultimately, "[i]t is not necessary that the insurer be aware of the particular acts being

performed by the broker; once the insurer has created the appearance of authority, the insurer is estopped to deny it, even though the insurer may be ignorant of its exercise." *Id.*

Landmark cites several cases to establish that, under Illinois law, AJG was only a broker and not its agent. First, Landmark references a series of cases distinguishing between insurance brokers and agents of insurers; in essence, these cases establish that a broker is a "middleman between the insured and the insurer" who procures insurance "under no employment from any special company." (R. 136, Reply at 14 (quoting *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 264 (7th Cir. 1986)).) Further, Landmark suggests that "[w]hether an insurance broker is an agent of an insurer can be decided as a matter of law when the evidence clearly indicates that the broker is the agent of the insured." (*Id.* at 15 (citing *Am. Safety Cas. Ins. Co. v. City of Waukegan*, 2009 WL 855795, at *7 (N.D. Ill. Mar. 30, 2009)).) Landmark accurately notes that, in determining whether an insurance intermediary is an agent or a broker, Illinois courts consider four factors: "(1) who put the agent in motion; (2) who controls the agent's actions; (3) who pays the agent; and (4) whose interest does the agent represent." (*Id.* (citing *Geneva Assurance Syndicate, Inc. v. Associated Agencies, Inc.*, 1999 WL 731788, at *3 (N.D. Ill. Aug. 30, 1999)).) Landmark argues that these factors militate against finding that AJG was its agent, as "Landmark did not put AJG in motion, did not retain or pay AJG, and . . . AJG has never represented the interests of Landmark." (*Id.*)

However, these arguments are irrelevant to whether AJG was Landmark's *apparent* agent; all the cited cases concern whether a broker was an *actual* agent. While these cases would have a bearing on whether Landmark had explicitly entered into an agency relationship with AJG or whether AJG was its agent based on a continuing business relationship, they are misleading when scattered throughout Landmark's argument that AJG was not its apparent agent. Whether

actual agency exists is a question of control, business relationships, and the actions of the agent, *Geneva Assurance Syndicate*, 1999 WL 731788, at *3; whether apparent agency exists is a question of the principal's actions and whether they would lead a reasonable third party to believe an agency relationship exists, regardless of the underlying business structure, *Molda*, 36 N.E.3d at 416. Landmark has put forth the more demanding tests that apply in actual agency contexts as though they also govern apparent agency cases. For these reasons, the Court finds these arguments to be unpersuasive.

Landmark also argues that it did not establish apparent agency by communicating with Deerfield through AJG because "[a]s is clear from the underwriting file, Landmark never corresponded directly with AJG. Instead, Landmark['s] own insurance broker, McAuley Woods, communicated with AJG." (R. 136, Reply at 13.) Landmark further argues that "[n]o reasonable insured would believe AJG to be Landmark's agent, especially given the fact that the only direct communication between AJG and Landmark occurred at the time of notice in December 2014." (*Id.* at 13-14.) Again, while Landmark may be correct that a bird's-eye view of all the relevant documents governing Landmark's relationship with AJG would not lead a reasonable insured to infer that AJG was its agent, Landmark neglects that this information was not all available to the insured at the relevant time. While the underwriting file might counter a perception that Landmark treated AJG as its agent, insureds do not typically have access to their underwriting file, which is composed of the insurance company's internal documentation. Similarly, the fact that Landmark allegedly sent its policy, notices, and other communications to AJG via its agent McAuley Woods was not necessarily evident to Deerfield. There is no evidence that Deerfield was ever aware that McAuley Woods was involved in its Landmark policy at all. It is quite possible that, from Deerfield's perspective, it received all correspondence related to its policy

through AJG; whether it passed through anyone else's hands in the process may not have been evident. Landmark is correct that, if apparent agency existed, it must have been established through its actions. *Molda*, 36 N.E.3d at 416. However, it fails to acknowledge that the standard for apparent agency focuses on the principal's actions *as perceived by* the third party. *See Petrovich v. Share Health Plan of Ill., Inc.*, 719 N.E.2d 756, 767 (Ill. 1999) (recognizing the "general rule" that private instructions, limitations, or arrangements do not control a claim of apparent agency). The question is not whether Landmark's private or internal actions gave Deerfield reason to believe AJG was Landmark's agent; it is whether Landmark's actions, from Deerfield's perspective, would lead a reasonable insured to believe that Landmark treated AJG as its agent. It is less significant that Landmark did not correspond directly with AJG than it is that all correspondence to Deerfield apparently took place through AJG.

Deerfield argues that, under *State Security Insurance Co. v. Burgos*, 583 N.E.2d 547, Landmark's actions were sufficient to create an apparent agency relationship with AJG from Deerfield's perspective. In *Burgos*, the insured, Ramon Soto Burgos, purchased liability insurance for his grocery store through a broker, Raymond Patis. *Id.* at 549. When a customer was shot outside the store, Burgos notified Patis immediately and Patis stated that "he would take care of the situation" although he believed Burgos would not be liable for the shooting and thus the policy would not apply. *Id.* Patis first notified the insurance company, State Security Insurance Co. ("State") of the incident when he forwarded the complaint and summons the insured received two years later. *Id.* After receiving the complaint, State issued a reservation of rights and filed a declaratory judgment to determine whether it was obligated to indemnify Burgos, alleging that he had failed to comply with the policy's provision requiring that notice of

an occurrence be given "as soon as practicable." *Id.* The Illinois Supreme Court summarized the relationship between the parties:

> The policy in question was procured for the Burgoses by Patis, the Burgoses' insurance broker. Patis had been handling all of the Burgoses' insurance needs for over 20 years prior to this occurrence. The policy was issued by the plaintiff insurance company through its agent, Guild Insurance Agency (Guild). Guild transmitted the policy to Patis, who delivered the policy to the Burgoses. The Burgoses paid all premiums on the policy to Patis, who forwarded them to Guild. All notices regarding cancellation, premium changes and renewals were sent by Guild to Patis, who forwarded them to the Burgoses. All communication between plaintiff or Guild and the Burgoses was conducted through Patis. Patis received a commission from Guild for placing the Burgoses' insurance with plaintiff.

*Id.* at 549-50. In addition, the policy's declarations page listed Guild as the "Agent or Broker" for State, but Patis, before sending the policy to Burgos, placed a sticker with his own business's contact information over Guild's name and address. *Id.* at 550.

The Illinois Supreme Court found that State's "manner of dealing with Patis and the Burgoses created the appearance that Patis had authority to accept notice of occurrences." *Id.* at 552. Specifically, State communicated with Burgos solely through Patis; even though it could have contacted Burgos directly, State's "decision to use Patis as its intermediary for every aspect of its transactions with the Burgoses" made it "reasonable for the Burgoses to believe that Patis was authorized to receive notice on plaintiff's behalf." *Id.* In particular, State sent all notices to its own agent, Guild, who forwarded them to Patis, who then sent them to Burgos. *Id.* Although the role of an insurance broker is typically to simply negotiate and obtain a policy for the insured, "[w]hen a 'broker' performs the additional functions of delivering the policy to the insured and collecting premiums on behalf of the insurer, he is generally considered to be doing so as an agent of the *insurer*." *Id.* Ultimately, "[t]here is no magic in the term 'broker' that will

permit an insurance company to hide behind him in case of a loss and insist that he is the representative of the [insured]."[7] *Id.* (citation omitted).

Landmark argues that *Burgos* is inapposite, as "[t]here is no testimony or evidence that Landmark relied on AJG to deliver policies, bill or collect premiums, or to mail notices of any sort." (R. 136, Reply at 16.) Instead, it cites two later Seventh Circuit cases interpreting Illinois law, *Archer Daniels Midland Co. v. Hartford Fire Insurance Co.*, 243 F.3d 369 (7th Cir. 2001), and *Mizuho Corporate Bank (USA) v. Cory & Associates, Inc.*, 341 F.3d 644 (7th Cir. 2003), where insurance brokers were found not to be apparent agents despite playing some intermediate role between the insurer and the insured. (R. 136, Reply at 15.) Landmark argues that "[t]he connection between Landmark and AJG here is more tenuous than the relationships between the insurer and the purported broker" in these cases, "requiring a finding that there is no agency relationship." (*Id.*)

As an initial matter, Landmark's suggestion that its relation to AJG is less direct than those in *Archer Daniels Midland* and *Mizuho* seems to rely on its aforementioned argument that it only interacted with AJG through its retained agent, McAuley Woods. As noted above, the existence of intermediaries that are invisible to the insured would not be relevant to determining whether Landmark vested AJG with *apparent* agency. Further, the Court notes that *Burgos*, which found apparent agency based on a course of dealing with the insured through the broker, also involved an intermediary agent through which the insurer communicated with the broker. *Burgos*, 583 N.E.2d at 549-50. Because the Illinois Supreme Court did not attach any

---

[7] The Illinois Supreme Court described several additional factors supporting its conclusion that State had imbued Patis with apparent authority, including the ambiguity of the policy's language regarding the identity of State's "agent or broker," the foreseeability of Patis listing himself as the representative, and the customary practice of insureds tendering notice through brokers to whom they pay their premiums. *Id.* at 553-55. However, the court was clear that these "additional" reasons "further strengthened" its conclusion that Patis had apparent agency, and that State's practice of communicating with Burgos solely through Patis was sufficient on its own. *Id.* at 553-54.

significance to the use of this intervening agent, neither will this Court when applying Illinois law.

Further, Landmark's cases do not overcome the striking similarities between this case and *Burgos*. In *Archer Daniels Midland*, the court found that the broker simply receiving the policy from the insurer and transferring the premium from the insured to the insurer was not sufficient to establish apparent agency to make underwriting decisions. 243 F.3d at 373-74. The court noted in particular that the insured "must establish not simply that [the broker] had authority to receive money and shuffle (or even sign) papers on [the insurer's] behalf but also that it was [the insurer's] agent for the purpose of deciding what risks to accept, and at what price." *Id.* at 373. If the insured "really thought that [the broker] had *that* authority, then [the insured] must have believed that the world was its oyster." *Id.* In other words, while a history of mediating transactions could indicate apparent authority for some typically administrative purposes, such as accepting payment or signing papers, it was not reasonable for the insured in *Archer Daniels Midland* to believe that the broker had been given authority to actually make high-level business decisions on behalf of the insurer. Although the court did not discuss where accepting notice would fall on this scale, it seems clear that accepting notice of a claim is much closer to assistive administrative tasks than to substantive strategy decisions. The Seventh Circuit also found it significant that, although brokers may sometimes serve as the agents for both parties, in that case the insured "was shopping in an international market, and it hired [the broker] to be its long-term champion. Only an exceedingly foolish insurer would have deemed [the broker] its agent in the same transactions[.]" *Id.* The court concluded that the insured, a major corporation that was seeking to take out a $50 to $100 million insurance policy, was "too sophisticated to believe that for a big-stakes transaction an insurer would appoint as its agent a

23

firm that had already promised to put [the insured's] interests first." *Id.* While the Seventh Circuit did find that merely acting as an intermediary was insufficient to create apparent authority in that case, this finding was influenced by the nature of the authority at issue and the high sophistication of the insured. In the present case, the authority in question was specifically authority to act as an intermediary for purposes of notice, and there is no evidence before this Court that Deerfield or any of its employees had any particular sophistication with insurance matters. *Archer Daniels Midland*, therefore, does not carry the day for Landmark.

In *Mizuho*, also cited by Landmark, the Seventh Circuit held that where an insurer "relied exclusively on [the broker] for communication of policy information during the negotiation phase" but "did no more," the insurer did not vest the broker with apparent authority. 341 F.3d at 656. In deciding *Mizuho*, however, the Seventh Circuit explicitly contrasted that case with *Burgos*; while it distinguished *Burgos*, it did so on the grounds that the *Burgos* insurer engaged in a "course of dealing" in which the insurer communicated consistently with the insured only through the broker "long after the procurement process was completed." *Id.* at 655-56. The insurer in *Mizuho*, by contrast, only used the broker as an intermediary during the initial negotiation phase. *Id.* at 656. Because the primary role of insurance brokers is to negotiate and deliver policies to their customers, the Seventh Circuit declined to expand *Burgos* to situations where brokers only performed their core functions; instead, it recognized that *Burgos*'s holding remained intact in situations where brokers continued acting as an intermediary on a continuing basis once the insurer and insured had already entered into a business relationship. *Id.* at 656.

Whether *Burgos* or *Mizuho* governs the present case depends on the nature of communications between Landmark and Deerfield. If AJG merely performed traditional broker services, such as procuring and initially negotiating the policy, then *Mizuho* suggests that

Landmark did not vest AJG with apparent authority for purposes of receiving notice. If, however, Landmark used AJG as its intermediary for all its interactions with Deerfield, then *Burgos* would militate the finding that Landmark's actions created apparent authority.

As Deerfield's apparent-agency argument is an affirmative defense, Deerfield would bear the burden of proving it at trial. Accordingly, in order to survive summary judgment, Deerfield must put forth sufficient evidence to create an issue of fact on this affirmative defense. *See Celotex Corp. v. Catrett*, 477 U.S. at 324; *see also Springfield Oil Servs., Inc. v. Mermelstein*, 914 F. Supp. 258, 264 (N.D. Ill. 1996) ("[Defendant] bears the burden of proof on this affirmative defense, and must present at least some evidence in support of it to defeat [Plaintiff's] motion for summary judgment.").

Construing the record in Deerfield's favor and affording it every favorable inference, the Court finds sufficient evidence for a reasonable jury to conclude that Landmark dressed AJG with apparent authority under *Burgos*. Nowhere in the record, either in Landmark's underwriting file or in the submitted depositions, is it established how Landmark customarily communicated with Deerfield on a routine basis, such as delivery of billing statements and collections of premiums. There is only a single demonstrated instance in which Landmark communicated directly with Deerfield: when Deerfield requested a copy of its loss history with Landmark in February 2010, Landmark's parent company RSUI sent the requested information directly to

Deerfield.[8] (R. 136-2, Underwriting File at 7.) Apart from this single email, all communications between Landmark and Deerfield appear to have taken place through AJG and McAuley Woods. (*See, e.g., id.* at 19-27 (negotiating policy limit increases in June 2007).) After receiving actual notice of the lawsuit from AJG in December 2014, Landmark acknowledged receipt of notice directly to AJG without contacting Deerfield. (R. 121, Def.'s SOF ¶ 12.) Further, RSUI's Vice President of Excess Claims Kevin O'Connor acknowledged in his deposition that Landmark would "more often" discuss matters with the broker than with clients directly. (R. 121-2, O'Connor Dep. at 109.) He also testified that, when Landmark issued policies, he knew that they were issued to the brokers but did not know whether they were provided to the insureds. (*Id.* at 164.)

Landmark offers no evidence that it ever communicated directly with Deerfield except for the single 2010 email mentioned above. Landmark acknowledges that "[t]here is no testimony or evidence that Landmark relied on AJG to deliver policies, bill or collect premiums, or to mail notices of any sort," but it also fails to provide any evidence concerning these communications. (R. 136, Reply at 16.) Further, by failing to respond to Deerfield's statement of additional facts, Landmark has admitted that it never communicated directly with Deerfield. (R. 121, Deerfield's Add'l Facts ¶ 28.)

Although the record does not directly establish how Landmark handled its more day-to-day interactions with Deerfield, the Court finds that a reasonable jury may infer that Landmark's

---

[8] Deerfield's original request was not sent directly to Landmark, however. Instead, Deerfield forwarded its request (addressed to Landmark) to Tracy Holcomb of Laurus Strategies, who sent it to Jean Busch of Westrope, who sent it to Bryant Rhyne of an undisclosed organization, who sent it to Peggy Miller who is also unidentified. (R. 136-2, Underwriting File at 9-16.) Shortly thereafter, Cindy Vadner of RSUI sent the requested information directly to Deerfield. (*Id.* at 7.) The record does not reflect who any of these individuals or organizations or whether they are associated with any of the parties in this case. At one point years earlier, Tracy Holcombe forwarded information from one AJG employee to another in the process of seeking a higher insurance limit for Deerfield, suggesting that Laurus Strategies and AJG worked closely together at some point. (*Id.* at 33-35.)

history of communicating with Deerfield through AJG persisted throughout their business relationship, which under *Burgos* would establish that AJG was Landmark's apparent agent for purposes of notice. Landmark has failed to show that there is no genuine issue of material fact regarding its communications with Deerfield. Because this factual dispute is potentially dispositive of this suit, the Court must deny Landmark's motion for summary judgment.

## II.    Motion to Disqualify and for Sanctions

### A.    Disqualification

Deerfield seeks to disqualify Traub from continuing to represent Landmark in this case. Deerfield argues that Traub violated ABA Model Rules of Professional Conduct 1.7 and 1.9, which forbid attorneys from representing a client if it would create a concurrent conflict of interest or a conflict of interest with a former client, respectively.

A two-step analysis guides a court's consideration of a motion to disqualify counsel: "First, the court considers whether an ethical violation has occurred. Second, if the Court finds such a violation, the court then determines whether disqualification is the appropriate remedy." *Metro. Life Ins. Co. v. Guardian Life Ins. Co. of Am.*, No. 06 C 5812, 2009 WL 1439717, at *2 (N.D. Ill. May 18, 2009). Even if there has been an ethical violation, disqualification does not automatically follow, but falls within the Court's discretion. *Id.*; *see also Jang v. Woo Lae Oak, Inc. Chi.*, No. 12-CV-00782, 2013 WL 3270649, at *4 (N.D. Ill. June 27, 2013) (collecting cases). In considering motions to disqualify, courts must balance "the sacrosanct privacy of the attorney-client relationship (and the professional integrity implicated by that relationship) and the prerogative of a party to proceed with counsel of its choice." *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983). "Although courts have a duty to safeguard the attorney-client relationship, it must also be recognized that disqualification, as a prophylactic device for

protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Bartlett v. Bartlett*, No. 16 CV 6595, 2016 WL 7374276, at *1 (N.D. Ill. Dec. 20, 2016) (internal quotation marks omitted) (citing *Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205*, 17 F.3d 1059, 1066 (7th Cir. 1994)).

Local Rule 83.50 adopts the ABA Model Rules of Professional Conduct such that they apply to attorneys practicing in this District. N.D. ILL. L.R. 83.50. Model Rule 1.7 provides that, unless each client provides informed consent, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," which exists if "the representation of one client will be directly adverse to another client" or if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person." MODEL RULES OF PROF'L CONDUCT r. 1.7. Model Rule 1.9 mandates that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." MODEL RULES OF PROF'L CONDUCT r. 1.9.

Deerfield argues that, by reviewing the Keeping case file to identify any appealable issues, Traub acted as a lawyer in its defense and entered into an attorney/client relationship with Deerfield. Deerfield appears to argue that Traub violated Model Rule 1.7 by representing Deerfield for purposes of appeal and representing Landmark for purposes of investigating coverage issues at the same time, and also that Traub violated Model Rule 1.9 by representing Landmark in the current litigation after previously representing an adverse party, Deerfield.

Because Model Rule 1.7 and Model Rule 1.9 are both prohibitions against representing multiple clients in different circumstances, the Court must first establish whether Traub entered

into an attorney-client relationship with Deerfield at all. Typically, an attorney-client relationship is created through an express contract. However, "[e]ven where no express contract has been entered into or where no fees are paid, an 'implied' attorney-client relationship may be shown if a party submitted confidential information to a lawyer with the reasonable belief that the lawyer was acting as the party's attorney." *Metamorfyx, L.L.C. v. Belkin Components*, No. 02 C 0771, 2002 WL 1308633, at *3 (N.D. Ill. June 14, 2002). Deerfield argues that just such an implied professional relationship was created here when Traub allegedly undertook to aid in Deerfield's defense before representing Landmark in this coverage dispute. Deerfield cites in particular *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978), which identified several instances creating an implied professional relationship, including that: "When an insurer retains an attorney to investigate the circumstances of a claim and the insured, pursuant to a cooperation clause in the policy, cooperates with the attorney, the attorney may not thereafter represent a third party suing the insured nor indeed continue to represent the insurer once a conflict of interest surfaces." *Id.* at 1319. However, as has been acknowledged repeatedly since, the *Westinghouse* court noted immediately after the quoted language that this professional relationship "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Id.* (citation omitted); *see also Domanus v. Lewicki*, No. 08 C 4922, 2012 WL 6568227, at *5 (N.D. Ill. Dec. 14, 2012) ("*Westinghouse* merely addresses the narrow circumstances under which an implied attorney-client relationship has been established. . . . [A]n implied attorney-client relationship exists only if the client's subjective beliefs are reasonable."); *Metamorfyx*, 2002 WL 1308633, at *3 (recognizing that, in *Westinghouse*, "[t]he deciding factor [for establishing an implied professional relationship] is what the prospective client thought when he made the disclosure, not what the lawyer thought"

29

(quoting *Westinghouse*, 580 F.2d at 1320 n.14)); *In re Marriage of Stephenson*, 955 N.E.2d 618, 627 (Ill. App. Ct. 2011) (finding that *Westinghouse* did not apply where the alleged client "did not consult [the lawyer] directly," did not know the lawyer would be consulted, and did not manifest his intention that the lawyer be consulted). Even if Traub stated to Olmstead or American States that it was retained by Landmark to assist with the defense, there is no evidence before this Court that Deerfield believed that Traub was representing Deerfield. In fact, Deerfield's president, Christopher Bunch, testified in an affidavit that "I was never advised by anyone . . . that [Traub] requested and was given access to Deerfield's file," that "I was never informed by anyone as to why [Traub] wanted to review Deerfield's file in the Underlying Litigation," and that "I never waived Deerfield's attorney-client privilege and never authorized [Traub] to access David Olmstead's file." (R. 128-6, Bunch Aff. at 1-2; *see also* R. 128, Mot. to Disqualify at 4 ("Deerfield never consented to [Traub's] review of its attorneys' file.").) Whatever Traub said, it did not say anything to Deerfield, and Deerfield thus could not have had the required subjective belief about Traub's role.[9] Thus, the Court finds that Traub never represented Deerfield and, even if it investigated potential post-trial issues, it did so solely as the representative of Landmark, which shared an independent interest in the outcome of the Keeping litigation.

---

[9] Although Deerfield does not confront this difficulty, it makes a passing reference in its reply to how "the conduct and actions of Deerfield's agent and attorney, David Olmstead, as well as Lisa Cruser suggests that they believed [Traub] had been assigned to represent Deerfield." (R. 147, Reply at 6.) While it is conceivable that an agent and attorney could manifest the belief and intentions necessary to create an implicit professional obligation, the Court declines to extend this doctrine so far. Deerfield bears the burden of demonstrating the existence of a current or former attorney-client relationship. *Sailsbery v. Vill. of Sauk Vill.*, No. 15 C 10564, 2016 WL 1402291, at *4 (N.D. Ill. Apr. 11, 2016). Deerfield has provided no argument or case law to support this position, and the Court finds that premising a conflict of interest on the implicit attorney-client relationship created by the subjective beliefs of an agent is far too attenuated to justify disqualification.

Even if Deerfield were able to establish that it had an attorney-client relationship with Traub, it has not demonstrated that Traub violated Model Rule 1.9. Model Rule 1.9 does not apply in this situation because Deerfield was, if anything, a current client when the conflict of interest arose, and Model Rule 1.9 concerns a conflict of interest with former clients. Although Deerfield does not differentiate between the two in its briefing, Deerfield presumably sees a Model Rule 1.7 conflict when Traub investigated post-trial issues and coverage issues at the same time, and a Model Rule 1.9 conflict when Traub initiated this lawsuit in representing Landmark. However, a current client is not made into a former client simply by the initiation of a new lawsuit. There must first be a breaking off of the attorney-client relationship, and undertaking adverse representation alone does not suffice. *See, e.g.*, *SWS Fin. Fund A v. Salomon Bros. Inc.*, 790 F. Supp. 1392, 1399 (N.D. Ill. 1992) (finding that law firm, which began adverse representation within two months of its last work for its original client, still had a current-client conflict when it filed an adverse complaint six months later because there had been no "terminating events"); *see also alfaCTP Sys., Inc. v. Nierman*, No. 15-cv-9338, 2016 WL 687281, at *4-5 (N.D. Ill. Feb. 19, 2016) (finding that client was not a current client after five-year lapse in services and two years of "overtly adverse acts and statements"). Because Model Rule 1.9 prohibits conflicts of interest with *former* clients, the fact that Deerfield was at most a *current* client forecloses any violation of Model Rule 1.9.

The Court need not resolve whether Traub's investigation of coverage issues while also investigating post-trial issues would constitute a conflict of interest under Model Rule 1.7 because it has found that Traub never created an attorney-client relationship with Deerfield, either explicitly or implicitly. Even if Traub had violated Model Rule 1.7, however, Deerfield has not established that disqualification would be an appropriate remedy. Model Rule 1.7 has

31

two fundamental purposes: "First, it serves as a prophylactic to protect confidences that a client may have shared with his or her attorney." *SWS Fin. Fund*, 790 F. Supp. at 1401. Its second purpose "is to safeguard loyalty as a feature of the lawyer-client relationship. A client should not wake up one morning to discover that his lawyer, whom he had trusted to protect his legal affairs, has sued him." *Id.* The present case does not implicate either of these purposes.

Traub's alleged conduct did not endanger the confidentiality of Deerfield's attorney-client relationship with Olmstead, as Landmark had the right to inspect the Keeping case file. As Landmark and Traub note in their responses, *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 579 N.E.2d 322 (Ill. 1991), provides the governing rule here. (*See* R. 143 at 7; R. 144 at 11-13.) In that case, the Illinois Supreme Court found that an insurer was entitled to litigation files based on the policy's cooperation clause and on the common-interest doctrine. *Id.* at 326-29. The cooperation clause in Landmark's policy is narrower than the one in *Waste Management*, which was "without limitation or qualification." *Id.* at 328. Here, by contrast, the cooperation clause only requires the insured to cooperate "in the investigation or settlement of the claim or defense against the 'suit.' " (R. 1-3, American States Policy at 49.) However, the common-interest doctrine as set forth in *Waste Management* establishes that the litigation file was not confidential as to Landmark. Where "both insurers and insureds ha[ve] a common interest either in defeating or settling the claim against insureds" and "the communication by insureds with defense counsel is of a kind reasonably calculated to protect or to further those common interests," those communications are not privileged. *Waste Mgmt.*, 579 N.E.2d at 328. This is true even "where the attorney, though neither retained by nor in direct communication with the insurer, acts for the mutual benefit of the insured and the insurer." *Id.* at 329. After all, "counsel for insured did represent both insureds and insurers in [the underlying litigation] since

insurers were ultimately liable for payment if the plaintiffs in the underlying action received either a favorable verdict or settlement." *Id.*

Deerfield attempts to distinguish *Waste Management* by arguing that it involved a discovery dispute arising after the insured knew that the insurer was acting against its interests. (R. 147, Reply at 9.) Deerfield concludes that "[w]hile Olmstead's file may ultimately be discoverable in this litigation, [Traub] should not have obtained the file before litigation under the pretense that it was assisting in Deerfield's defense while actually advising Landmark to deny insurance coverage." (*Id.*) Deerfield misreads *Waste Management*. The Illinois Supreme Court noted that the parties in that case spent the bulk of their briefs discussing relevance and other discovery justifications for circumventing attorney-client privilege, but ultimately held that due to the cooperation clause and common-interest doctrine "the attorney-client privilege has no application in this case" and therefore found that discussion of discovery theories "would only be superfluous." *Waste Mgmt.*, 579 N.E.2d at 327.

The issue before this Court is not whether Landmark and Traub have a right to the files *now* and illicitly accessed them *then*, as Deerfield suggests. Instead, under the common-interest doctrine, Landmark has had a right to examine the Keeping case file throughout, and thus the file does not constitute confidential information regardless of whether Traub was representing Deerfield. Beyond the case file in the underlying lawsuit, Deerfield has not identified any allegedly confidential information to which Traub gained access.[10] Disqualifying Traub would

---

[10] Deerfield argues that "[i]t is Landmark's responsibility to rebut the presumption that this access provided it with knowledge of Deerfield's confidential information." (R. 128, Mot. to Disqualify at 9.) The case on which Deerfield relies, however, states only that it is presumed that an *attorney* has knowledge of confidential information possessed by his *law firm*, not that it is presumed that law firms will communicate privileged information to clients. *Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 723 (7th Cir. 1982).

not serve to protect the confidences Deerfield allegedly entrusted to Traub, because the litigation files were not confidential as to Landmark.

Neither is disqualification warranted to "safeguard loyalty" by punishing an attorney's betrayal of long-established trust. According to Deerfield's president, Christopher Bunch, Deerfield was not even aware that Traub had become involved in the case until after Landmark's reservation of rights letter was received. (R. 128-6, Bunch Aff. at 1-2.) This is not a case, then, where Deerfield's "expectations of loyalty were so cavalierly trampled that disqualification is warranted as a sanction." *SWS Fin. Fund*, 790 F. Supp. at 1402. Although the betrayal of a trust may warrant such steps, Deerfield's utter lack of any interaction with Traub means that the integrity of the trust central to the attorney-client relationship is not at issue in this case. *See id.* (finding disqualification inappropriate in a case that "is at the polar extreme from the case in which an individual has a personal relationship with a particular attorney who provides for all or substantially all of that client's legal needs").

Even if Traub had violated the Model Rules of Professional Conduct, disqualifying Traub as Landmark's counsel would not serve any purpose protected by the rules governing conflicts of interest. Disqualification would not protect confidential disclosures to a former attorney, nor would it vindicate an egregious betrayal of trust. Despite Deerfield's protestations that violating the Model Rules "in and of itself[] prejudices Deerfield" and that it "in and of itself[] prejudices Deerfield because it sows distrust in the members of the bar," (R. 147, Reply at 11), the Court cannot discern any particular advantage to any party in this case from taking this drastic step. Because Traub never entered into an attorney-client relationship with Deerfield, never gained access to any confidential information, and Deerfield has not established any actual prejudice it would suffer from Traub's continued representation of Landmark, this Court declines to

34

disqualify Traub. *See, e.g., Jang*, 2013 WL 3270649, at \*5 (declining to disqualify counsel where former client would suffer no harm and attorneys received no confidential information); *McCook Metals L.L.C. v. Alcoa*, No. 99 C 3856, 2001 WL 58959, at \*3 (N.D. Ill. Jan. 18, 2001) (refusing to disqualify counsel where confidences had not been breached and the moving party failed to establish how it would have been harmed by the representation). For these reasons, the Court denies Deerfield's motion to disqualify.

## B.    Sanctions

In addition to seeking disqualification, Deerfield also moves for sanctions against Traub and Landmark. Deerfield seeks the following relief with regard to Traub's alleged violations of the Model Rules of Professional Conduct: (1) the production of all communications between Landmark and Traub prior to the filing of this declaratory judgment action; (2) disqualification of Traub from this litigation; (3) dismissal of Landmark's complaint; (4) monetary sanctions against Landmark and Traub, including attorneys' fees for defending this action; and (5) any other relief this Court deems appropriate. (R. 128, Mot. to Disqualify at 9.)

This Court has the "inherent authority" to take "actions that protect and vindicate the judicial process and the judicial institution itself," including to "discipline attorneys for misconduct." *Carlson v. United States*, 837 F.3d 753, 771 (7th Cir. 2016). In determining whether sanctions for ethical violations are appropriate, this Court considers "the seriousness of the violations and whether the violations were intentional, as well as the nature and extent of prejudice suffered or likely to be suffered by the parties in the future as a result of the violation." *Tomasian v. C.D. Peacock, Inc.*, No. 09 C 5665, 2012 WL 2590493, at \*11 (citation omitted).

After careful consideration of these factors, the Court has concluded that granting the requested relief would not be appropriate in this case. In particular, the Court finds that Deerfield

has provided no evidence that Landmark acted in bad faith to intentionally harm Deerfield.[11]

Further, the Court observes that Deerfield has failed to identify any credible prejudice that it has suffered as a result of Traub's alleged conduct. Deerfield attempts to dance around this issue, arguing that Landmark would not have assigned Traub to review the file if such a review would not prejudice Deerfield. (R. 147, Reply at 10.) It also suggests that Traub's conduct "in and of itself[] prejudices Deerfield because it sows distrust in the members of the bar." (*Id.* at 11.) But Deerfield fails to identify a single way in which Traub's alleged conduct has harmed Deerfield, as a party, or any specific information that Traub could have accessed that would be relevant to this case. After considering the record, this Court finds that sanctions are not appropriate. Accordingly, Deerfield's motion for sanctions is denied.

## CONCLUSION

For the foregoing reasons, Landmark's motion for summary judgment (R. 86) is DENIED and Deerfield's motion for disqualification and sanctions (R. 128) is DENIED. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all efforts to settle the case.

If the parties do not settle, then this Court will proceed with a potential expedited, bifurcated trial. First, the parties will try the issue of apparent agency to determine whether notice to AJG immediately after the Keeping accident was effective on Landmark, focusing

---

[11] Deerfield posits that Landmark was on notice that hiring the same counsel for defense and coverage purposes was inappropriate based on the ruling in *West Side Salvage, Inc. v. RSUI Indemnity Co.*, No. 3:13-cv-00363-MJR-PMF, 2013 WL 6169927 (S.D. Ill. Nov. 23, 2013), where Landmark's cousin company also used Traub to represent it in both capacities. (R. 128, Mot. to Disqualify at 8-9.) Deerfield argues that this conduct was "prohibited" in that case and that Traub "failed to heed" the ruling when it was "warned" that such conduct was unacceptable. (*Id.* at *9.) Because that case solely concerned the discoverability of the insurer's correspondence with Traub and did not involve any consideration of the Model Rules of Professional Conduct or sanctions, the Court finds that *West Side Salvage* only put Traub on notice that its correspondences with the insurer may be discoverable as the attorney-client privilege does not attach as against its insured.

evidence on the business relationships between Landmark, AJG, and Deerfield. If this first phase does not resolve this case, the second phase of the trial will focus on whether notice to Landmark in December 2014 was reasonable as to an excess insurer in light of the facts of the Keeping case, as well as on the third-party claims.

The parties shall appear for a status hearing on February 7, 2017, at 9:45 a.m.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: January 12, 2017**